IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CATHERINE HELMUTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:19-cv-601-RAH-SMD |
| | ) | (WO) |
| TROY UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Catherine Helmuth ("Helmuth" or "Plaintiff") filed this discrimination action against Defendant Troy University ("Troy" or "Defendant") after Troy rescinded an offer of employment to Helmuth. Helmuth contends that Troy failed to hire her on the basis of her gender and disability, otherwise failed to accommodate her disability, improperly questioned her about her disability, and failed to reimburse her for the travel expenses that she incurred to attend her interview. Troy has filed a motion for summary judgment ("Motion"), (Doc. 21), which from the Court's viewpoint, only sought summary judgment on certain claims raised in Helmuth's Complaint.

Upon consideration of the record, the submissions of the parties, and the relevant law, and for the reasons stated more fully below, the Motion is due to be denied in part and granted in part.

1

## I.   STANDARD OF REVIEW

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(a). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id*. at 324.

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B). Thus, in opposing summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255. But if the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 323.

## II.   JURISDICTION

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to Helmuth's federal causes of action. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## III.   BACKGROUND

### A.   Factual Background

The pertinent facts, construed in a light most favorable to Helmuth as the non-moving party, are as follows:

Helmuth has been diagnosed with a bone condition, ophthalmic condition, and an endocrine disorder. (Doc. 26-5, p. 2.) Her bone condition significantly limits the normal functioning of her orthopedic system, and her ophthalmic condition and endocrine disorder also impact several of her major life activities. (*Id*.)  Yet despite her physical limitations, Helmuth has achieved commendable academic success.

In the Fall of 2017, Helmuth was enrolled in the Raymond J. Harbert College of Business at Auburn University. (*Id*., p. 1.) She was poised to receive her PhD in

Business Administration in the Spring of 2018, and accordingly she began looking for full-time employment. (*Id.*)   High on Helmuth's list was Troy University's Sorrell College of Business ("Sorrell"), where her husband, Dr. Sebastien Vendette ("Vendette"), was already employed as an assistant professor at its Phenix City, Alabama campus. (*Id.*)

In November of 2017, department chair, Dr. Robert Wheatley ("Wheatley"), emailed Helmuth regarding a vacancy in Sorrell's Management Department as an assistant professor at Troy's main campus in Troy, Alabama. (*Id.*) As advertised, the start date for the position was January 1, 2018, and paid an annual salary of $85,000 to $90,000. (*Id.*; Doc. 25-3, p. 16.)  Wheatley encouraged Helmuth to apply. (*Id.*, p. 1.)

Helmuth informed Wheatley that she was scheduled to undergo surgery in December 2017 and explained that the position's January start date gave her pause in applying.  Wheatley insisted that Helmuth should apply regardless, believing Troy could be flexible on the timing of a start date. (Doc. 25-1, p. 6; Doc. 26-5, p. 1.) Helmuth submitted a completed application on November 28, 2017.[1] (*See* Doc. 24-3.)

---

[1] The record shows that there were two job postings for assistant professorships in the Management Department of Sorrell in the relevant time period: Position 2884 and Position 2354. (*See* Doc. 26-7; Doc. 26-8.) Because Position 2884 was posted on August 8, 2017 and had a start date of January 1, 2018, this is the position to which Helmuth formally applied. (Doc. 24-3, p. 1; Doc. 25-3, p. 1.) By contrast,

Helmuth participated in a preliminary interview via WebEx videoconference with Drs. Wheatley and Hank Findley ("Findley") on January 11, 2018. (Doc. 26-5, p. 2.) Dr. Findley, who was then-associate dean of Sorrell, testified that Helmuth "came across quite well" in the videoconference. (Doc. 25-1, p. 6.) In addition to discussing the specifics of the open assistant professor position, Helmuth also used this videoconference as an opportunity to inform Troy of her physical limitations, including that she was unable to drive, and to express her preference for working at the Phenix City campus where her husband was located.  (Doc. 26-5, p. 2.) She also indicated a willingness to teach online classes, as she had known Vendette to do. (*Id.*, p. 3.)

Several weeks later, Troy extended Helmuth an invitation to interview in-person. (*Id.*; Doc. 25-9, p. 5.) Gail Layton ("Layton"), the secretary for the Dean's Office at Sorrell, coordinated the logistics of the interview and was responsible for making Helmuth's travel arrangements and ensuring Troy provided Helmuth any necessary disability-related accommodations. (Doc. 25-8, pp. 4-7.) The two emailed back and forth, (*see* Doc. 25-9; Doc. 25-10), and discussed issues such as Helmuth's

---

Position 2354 was posted on January 5, 2018 (after Helmuth had already applied) and listed August 1, 2018 as the start date. (Doc. 25-3, pp. 6, 10.) Both positions were located in Troy, Alabama, though Position 2354 listed a slightly higher salary range of $90,000 to $100,000. (*Id.*, pp. 7, 9, 15.)

lodging, transportation, itinerary, and accommodations related to Helmuth's use of a wheelchair, (Doc. 25-9, pp. 2-3; Doc. 25-10, pp. 1-2).

Helmuth arrived on campus for her interview on February 5, 2018, accompanied by Vendette, who pushed her wheelchair to her various interview appointments. (Doc. 26-5, p. 3; Doc. 26-6, p. 5.) Over the course of the day, she met with several members of the Troy administration, including Wheatley, Findley, Chancellor Jack Hawkins ("Hawkins"), and Dr. Judson Edwards ("Edwards"), the Dean of Sorrell.

While her interview and presentation garnered positive feedback, (*see* Doc. 24-1, p. 10), according to Helmuth, the day did not pass without incident.  During two separate conversations with Hawkins and Findley, Helmuth was asked probing questions about her disability and medical condition, leaving Helmuth both uncomfortable and demeaned. (Doc. 26-5, pp. 3-5.)  For example, as Helmuth recalls, Hawkins asked several disability-related questions, including:

Why are you in a wheelchair?

How long will you be in a wheelchair for?

What are the doctors saying is wrong with you?

Where are you receiving medical care?

(Doc. 26-5, pp. 3-4.)

Hawkins does not specifically remember asking any of these questions, but he admitted in his deposition that it would not have been unusual for him to ask such

questions out of an expression of concern. (Doc. 26-4, pp. 6-7.) And, as he stated, such questions would not have been intended to disqualify Helmuth as a candidate. (*Id.*, pp. 9-10.)

Findley also brought up Helmuth's disability when he interviewed her, asking how Helmuth was doing, what her prognosis was, and whether she would be able to walk again. (Doc. 25-1, p. 7; Doc. 26-5, pp. 4-5.) To Findley, these questions also were an expression of concern and were not based upon any discriminatory intent. (Doc. 25-1, pp. 18-19.) And while they were on the topic of Helmuth's disability, Helmuth notified Findley that if she was assigned to teach at a campus location different (such as Dothan) from Vendette's location (Phenix City), she likely would need an accommodation in the form of scheduling flexibility or travel assistance. (Doc. 26-5, p. 5.)

Before her final interview of the day, Helmuth spoke with Wheatley in which Wheatley mentioned that a position at the Phenix City campus would be opening. (*Id.*; Doc. 26-6, p. 5.) When asked about this specific conversation in his deposition, Wheatley's only response was that he "did not recall." (Doc. 25-7, p. 11.)

Following her interviews, Troy decided to extend an offer of employment to Helmuth for an assistant professor position in Troy with an annual salary of $90,000. (Doc. 25-1, p. 9; Doc. 28-3.)  Edwards, the Dean of Sorrell, oversaw the hiring process for the position and delegated Findley to reach out and extend Helmuth the

offer. (Doc. 24-1, p. 11.)  He did so by phone on February 21, 2018.  (Doc. 25-1, p. 9.)  Rather than accepting it on the spot, Helmuth requested time to consider the offer. (Doc. 26-5, p. 5.)

In their follow up phone call (which apparently was recorded by Helmuth without Findley's knowledge),[2] Helmuth expressed concern with the terms of the offer, including that the position was located in Troy rather than Phenix City and that the salary of $90,000 was less than the starting salary ($100,000) that her husband, Vendette, had negotiated with Troy several years earlier upon his hiring in 2015. (Doc. 26-5, pp. 5-7; Doc. 26-6, pp. 2-3.) Helmuth maintains that Findley's tone throughout the call seemed "annoyed" and "dismissive"; but because Findley told Helmuth that he would take her concerns to the Dean, the call ended with Helmuth believing negotiation discussions were still underway. (Doc. 26-5, p. 6.)

Findley's summation of the February 23 phone conversation differs significantly from Helmuth's account. As Findley told it in his deposition, during the call, Helmuth stated that Troy's "offer was not acceptable because she wanted at least 130,000" and that she "wanted [only] to teach at Phenix City." (Doc. 25-1, pp.

_____

[2] Helmuth recorded the phone call and provided a transcript as part of her evidentiary submission offered in opposition to Troy's Motion. (*See* Doc. 26-5, pp. 12-25.) Troy submitted no objections to the transcript, and in its reply brief, acknowledged the transcript's authenticity by attempting to justify Findley's representations of the conversation. (Doc. 28, pp. 7-8.)  In significant part, the transcript differs from Findley's recollection of the call, especially as it concerns the discussion of salary.

9-10.)  And when Findley told her that there was no open position in Phenix City, Helmuth "asked to speak to the dean."  (*Id.*, p. 10.)

Following this call, according to Findley, he immediately spoke with Edwards about the call with Helmuth and her demands for a $130,000 salary and placement at the Phenix City campus.  For Edwards, Helmuth's demands were a nonstarter, and Edwards told Findley that "[i]f it's above $90,000 we can't do it." (*Id.*) He further confirmed that there was no position in Phenix City because of declining enrollment. (*Id.*) Findley and Edwards determined that Troy should not make Helmuth a counteroffer because Helmuth's salary request was $40,000 to $50,000 more than Troy's offer and "there is just no way for us to go there." (Doc. 24-1, pp. 11-12.)

Findley also approached Dr. Lee Vardaman ("Vardaman"), an associate provost who oversaw Troy's business operations for the academic division, (Doc. 26-1, p. 3), about Helmuth's salary demands, and in response, Vardaman made clear to him that Troy and Helmuth were "too far apart." (Doc. 25-1, p. 10.)

On February 27, 2018, Findley accordingly emailed Helmuth the following:

> We are sorry that you rejected our verbal job offer. After consulting with the Dean, we will be unable to extend you another offer, and the previous offer is no longer on the table. As I explained to you on Friday, there are no job openings on the Phoenix City (*sic*) Campus.

(Doc. 25-2.)

The only other communication between Troy and Helmuth concerned Helmuth's request for travel reimbursement of approximately $437.86, including

airfare. (Doc. 25-3, pp. 38-39.)  Having not heard anything back by late March, Helmuth sent a follow up email to inquire about the status of her reimbursement. (*Id.*, p. 38.) Findley ultimately responded, stating that the cost of flights is "not covered under [T]roy policy" without prior approval. (*Id.*, p. 37.) Helmuth continued to protest with two more follow up emails sent on March 28 and April 18, but those went unanswered.  (Doc. 25-3, p. 36; Doc. 25-8, p. 9; Doc. 26-5, p. 7.)

## B.    Helmuth's Proffered Comparators

Helmuth has identified four comparators for her discrimination claims:

### 1.    Sebastien Vendette  (hired in 2015)

Vendette, who is Helmuth's husband, is a male without a disability. (Doc. 26-6, p. 7.) In 2015, he was hired as an assistant professor in Sorrell at Troy's Phenix City, Alabama campus and successfully negotiated a salary of $100,000 with Findley and Wheatley.  (*Id.*, p. 3.)

According to Vendette, Helmuth's credentials during the relevant timeframe were more prestigious than his credentials and included a better publication record, a better presentation record, and an anticipated degree from a higher ranked PhD program. (*Id.*, p. 4; *see also* Doc. 26-10.) Moreover, he maintains that he was treated more appropriately and cordially throughout his own application and interview

process – a courtesy, he explains, that Troy did not give Helmuth. (Doc. 26-6, pp. 5-6.) Throughout his tenure at Troy, he regularly taught courses online. (*Id*., pp. 3-4.)

2.    James Fulford (offered in April 2018)

On January 5, 2018, James Fulford ("Fulford"), a male with an unknown disability status, applied for Position 2884 – the same position for which Helmuth applied. (Doc. 26-9.) After the failed negotiations with Helmuth, on April 5, 2018, Troy offered Fulford the position at a starting salary of $94,500. (Doc. 26-9, p. 17.) Fulford ultimately declined the offer.

3.    James Montgomery (offered in April 2018)

Following Fulford's decision to decline the offer, Troy offered the position to James Montgomery ("Montgomery"), a male without a disability, for $90,000. (Doc. 25-1, p. 15; Doc 25-3, p. 1; Doc. 25-4; Doc. 26-11.) Montgomery accepted the offer, with a starting salary of $90,000, which were the same terms offered to Helmuth. (Doc. 25-1, p. 15.)

4.    Christine Newman  (offered in April 2018)

Troy offered Position 2354 to Christine Newman ("Newman"), a female without a disability, on April 27, 2018. (Doc. 21-3, p. 2.)  Position 2354 was an assistant professorship position located at the Troy, Alabama campus at Sorrell with duties substantively equal to Position 2884 and with an annual salary of $90,000. (*Id*.)

11

### C.    Helmuth's Claims

Helmuth initiated the present action in 2019. In her Complaint, Helmuth asserts three causes of action. (*See* Doc. 1.) Beginning with Count I, she asserts disability discrimination pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504" or the "RA"). Helmuth asserts these claims on theories of failure to hire, failure to accommodate, and failure to offer nondiscriminatory terms of employment. Count II advances a claim of improper medical inquiries in violation of the ADA and Section 504. Finally, in Count III, Helmuth alleges gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII").  Similar to Count I, the allegations of gender discrimination rest on the theories of failure to hire and failure to offer nondiscriminatory terms of employment.

## III.   ANALYSIS

### A.    Applicable Legal Framework

A plaintiff may establish a claim for gender or disability discrimination in the absence of direct evidence, which is the case here. To do so, a plaintiff may present circumstantial evidence of discrimination under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Dulaney v. Miami-Dade Cty.*, 481 F. App'x 486, 489 (11th Cir. 2012) ("the burden-

shifting analysis of Title VII employment discrimination claims is applicable to ADA claims") (quoting *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007)); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (evaluating ADA claim under the *McDonnell Douglas* framework). Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case, and by doing so, creates a rebuttable presumption of discrimination. *Cleveland*, 369 F.3d at 1193. The burden then shifts to the defendant "to articulate a legitimate, non-discriminatory reason for the challenged conduct." *Id*. Notably, the defendant's burden at this stage is merely one of production, and it need not "persuade the court it was motivated by the [proffered] reason." *Id*. By meeting this burden, the defendant eliminates the presumption of discrimination and leaves the plaintiff with the ultimate burden of proving that the defendant acted with intentional discrimination. *Id*.; *Wascura v. City of S. Miami*, 257 F.3d 1238, 1243 (11th Cir. 2001). Specifically, the plaintiff must "proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual." *Wascura*, 257 F.3d at 1243. Failure to do so entitles the defendant to summary judgment on the claim. *Id*.

To make out a prima facie case of gender discrimination in a Title VII failure-to-hire context, and thus raise an inference of discriminatory intent, a plaintiff must show that: (1) she belongs to a protected class; (2) she applied and was qualified to

fill a position for which the employer was accepting applications; (3) she suffered an adverse employment action, i.e., despite her qualifications, she was not hired or was rejected; and (4) the defendant filled the position with a person outside the protected class or it remained open. *See Childress v. Caterpillar Logistics Servs.*, *Inc.*, 369 F. App'x 95, 96 (11th Cir. 2010); *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).

Establishing a *prima facie* case of disability discrimination under the ADA[3] requires a somewhat different showing. Specifically, a plaintiff alleging a violation of the ADA must show that: (1) she is disabled; (2) she was a qualified individual at the relevant time, "meaning [s]he could perform the essential functions of the job in question with or without reasonable accommodations"; and (3) she was subjected to an adverse employment action because of her disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); 42 U.S.C. § 12112(a). *See also McCoy v. Geico Gen. Ins. Co.*, 510 F. Supp. 2d 739, 748 (M.D. Fla. 2007) (noting that the

---

[3] Since disability discrimination claims under the ADA and Section 504 are subject to a similar legal analysis, for simplicity purposes, the Court will collectively refer to them as the ADA claim.  *See J.A.M. v. NOVA Southeastern University, Inc.*, 646 F. App'x 921, 926 (11th Cir. 2016) ("Discrimination claims under the RA are governed by the same standards used in ADA cases. In order to establish a prima facie case of discrimination under the RA or ADA, the plaintiff must demonstrate that he (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of his disability.").

*prima facie* elements required under the ADA for disparate treatment claims and failure-to-accommodate claims are the same).

### B.   Failure-to-Hire Claims

Helmuth principally contends that Troy's failure to hire her was based upon her disability (Count I) and/or her gender (Count III). Naturally, Troy disputes this contention and claims that Helmuth cannot establish her discriminatory failure-to-hire claims because Troy did, in fact, offer Helmuth the assistant professor position for which she applied and then rejected, and that Troy subsequently rescinded the rejected offer believing Helmuth wanted too much money. (Doc. 21, pp. 10-11.) Both parties acknowledge that these claims largely are based on circumstantial evidence and can be evaluated by applying the *McDonnell Douglas* framework.

### i.   Prima Facie Title VII Case - Gender

It is undisputed that Helmuth, as a female, is a member of a protected class and that Helmuth was qualified for the assistant professor position that was advertised by Troy.  Indeed, after interviewing for it, Troy offered her the position. However, the two remaining *prima facie* elements – which respectively require Helmuth to demonstrate that she suffered an adverse employment action and that either the position remained open or someone outside of her protected class was hired instead – remain deeply disputed by the parties.

In its brief, Troy questions whether Helmuth suffered an adverse employment action when she was, in fact, offered the position largely under the same terms and conditions as were detailed on the public job posting and later offered to and accepted by a subsequent candidate (Montgomery, a male candidate), after Helmuth failed to accept it. Troy further contends that Newman, a female candidate, ultimately accepted an identical position at the same $90,000 salary level,[4] thereby negating any claim that Helmuth was treated less favorably than someone outside of her class. (Doc. 21, p. 8; Doc. 21-3.)

In her response, Helmuth counters that these remaining elements are "easily satisfied on the record." (Doc. 27, p. 36.) As to the adverse employment action prong, Helmuth notes that Troy's ultimate decision not to hire her was unilateral and patently adverse. Troy cannot hide behind what it perceived as Helmuth's rejection, Helmuth further argues, to reframe her claim and evade liability. Moreover, as to the fourth element, Helmuth explains that because Troy continued interviewing candidates for both of its open Sorrell assistant professor positions until April 2018, the positions *remained open* for purposes of this summary judgment consideration.

### a.     Adverse Employment Action

---

[4] The Court recognizes that this representation conflicts with Troy's response to Helmuth's EEOC charge, (Doc. 25-3), in which Troy averred that Helmuth applied for Position 2884. As Troy explained there, this position ultimately was filled by a male applicant without a disability, later identified in the record as Montgomery, (Doc. 26-11), at a salary of $90,000.

The Court begins its analysis with the third element, which requires Helmuth to demonstrate that she suffered an adverse employment action. To this end, the Eleventh Circuit's standard for discrimination claims "require[s] an employee to establish an 'ultimate employment decision' or make some other showing of substantiality in the employment context in order to establish an adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Such decision, which has been held to include termination, failure to hire, or demotion, is one that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (citations omitted), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Helmuth relies upon a Virginia district court's opinion in *Majure v. Primland, Ltd.*, Case No. 4:17-cv-00033, 2017 WL 5013582 (W.D. Va. Nov. 2, 2017), to demonstrate that even where a plaintiff does not accept an employment offer, she nevertheless may have suffered an adverse employment action. As the district court in *Majure* recognized, a plaintiff need not accept an offer "meant to demean and demoralize her and subject herself to overbearing demands . . . ." *Id*. at *3. The district court there, which conducted its analysis at the motion to dismiss stage, went on to note that a plaintiff need not accept a position to support a claim for

discriminatory failure to hire just as she need not apply for a position to do the same. *Id*. (comparing the futile gesture doctrine).

Though *Majure* is not binding precedent here and though it does not appear that Helmuth contends that Troy's offer was meant to demean and demoralize her, it appears, based upon rulings made by other courts within the Eleventh Circuit, that Helmuth has sufficiently supported her assertion that Troy's decision to rescind[5] the offer constituted an adverse employment action for Title VII purposes, because it precluded Helmuth's future employment with Troy. *See Schultz v. Royal Caribbean Cruises, Ltd.*, 465 F. Supp. 3d 1232, 1273 (S.D. Fla. 2020) (withdrawal of employment offer was an adverse employment action because it precluded future employment opportunities and performances with defendant); *Salazar v. Hostmark*, Case No. CV 112-145, 2012 WL 6128435, at *2 (S.D. Ga. Nov. 20, 2012), *report & recommendation adopted*, 2012 WL 6127981 (S.D. Ga. Dec. 10, 2012) (finding withdrawal of job offer arguably satisfies the adverse employment action prong); *Thampi v. Manatee Cnty. Bd. of Comm'rs,* Case No. 8:07-CV-1445-T-TGW, 2009 WL 3762088, at *15 (M.D. Fla. Nov. 9, 2009) (recognizing a withdrawn job offer can be an adverse employment action). *See also E.E.O.C. v. Creative Networks, L.L.C.*, 912 F. Supp. 2d 828, 841 (D. Ariz. 2012); *Unal v. Los Alamos Pub. Sch.*,

---

[5] Interestingly, the record is devoid of any evidence that Helmuth would have accepted Troy's original offer once Helmuth was informed that Troy would not negotiate.

Case No. 1:13-cv-00367, 2015 WL 13260396, at *7 (D. N.M. Mar. 6, 2015), *aff'd*, 638 F. App'x 729 (10th Cir. 2016) ("[T]he withdrawal of Plaintiff's employment offer is an adverse employment action.").

Moreover, Troy's assertions that there has been no adverse employment action because Helmuth rejected Troy's offer of employment is dubious at best. True, the written transcript of the phone call between Helmuth and Findley reveals they discussed the terms of the offer. But never in the transcript does Helmuth state that she was rejecting the offer, or that the terms, especially the salary, were unacceptable. Helmuth's specific words, when discussing the $90,000 salary were to say, that "it was a bit lower than what [she] had expected. . ." but she "want[ed] to make something work." (Doc. 26-5, pp. 13, 15.) And even so, any discussion concerning Helmuth's questions about the terms of the offer and purported rejection thereof are better suited as part of the analysis concerning Troy's proffered legitimate non-discriminatory reasons. Because it is not clear from the record that Helmuth rejected Troy's offer, as Troy says, or that Helmuth was merely asking questions, as she says, the contract law implications are not sufficiently clear to require the entry of summary judgment in Troy's favor.

The bottom line as it concerns this prong of the analysis is that Troy's recission of the offer barred Helmuth from enjoying the opportunities and benefits that the position would have provided and therefore had a substantial adverse impact

on Helmuth's employment status. Helmuth has thus satisfied her burden of demonstrating she suffered an adverse employment action for summary judgment purposes.

> ### b.  *"Remained Open" Showing*

The final element of Helmuth's *prima facie* burden for her gender discrimination claim requires a showing either that Troy left the position open and "continued to seek applicants from persons of [Helmuth's] qualifications"; or that it hired an equally or less qualified applicant from outside of Helmuth's protected class. *McDonnell Douglas Corp.*, 411 U.S. at 802; *see Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275, 1275 n.6 (11th Cir. 2008) (noting more than one formulation of the prima facie elements exists and either of these showings is sufficient for a plaintiff to meet her burden at this juncture).

Here, some clarification of the positions at issue may be helpful, as Troy conflates the two advertised positions, and Helmuth likewise proposes that both position 2354 and 2884 be considered "available" for purposes of her failure-to-hire claim. (Doc. 27, p. 36 n.5.) She points out that both positions were 10-month, full time, and tenure track, and by doing so, she has demonstrated a recognition that the positions were practically interchangeable. And even where there were slight differences between the positions as advertised, namely the contrasting start dates, Troy's initial willingness to deviate from the posting shows that such differences

were never definitive. Given the positions' shared titles, substantively identical duties, and that Troy effectively considered Helmuth for both openings, there appears to be no compelling reason to consider them discretely.

In the instant case, both positions remained open insofar as Troy continued accepting applications after rescinding Helmuth's offer on February 23, 2018. As Findley explains, Troy went on to consider applications that were submitted by Montgomery and Newman on February 23 and March 9, respectively, and did not extend offers of employment to Montgomery and Newman until April of that year. That the positions remained empty, even for this abbreviated span of time, is sufficient for Helmuth to meet her initial burden. *See Saweress v. Ivey*, 354 F. Supp. 3d 1288, 1305 (M.D. Fla. 2019) (recognizing job candidate established prima facie case of race and/or national origin discrimination under Title VII where the position sought remained open and the employer continued to seek applications from other similarly qualified candidates). And for its part, Troy provides no counterargument as to the applicability of this "remained open" language, nor does it even go so far as to request this Court reach a divergent result here.

Because Helmuth has demonstrated that the position remained open, at least for a time, Helmuth has sufficiently stated a *prima facie* case of gender discrimination under Title VII. The Court now turns to whether Helmuth has made a parallel *prima facie* showing as required for her disability discrimination claim.

21

ii.   Prima Facie ADA Violation

Failure-to-hire claims under the ADA, like those brought under Title VII, also require the court to apply the *McDonnell Douglas* burden shifting rubric, beginning with the plaintiff's *prima facie* showing. *See Littleton v. Wal-Mart Stores, Inc.*, 231 F. App'x 874, 876 (11th Cir. 2007).

As to Helmuth's ADA *prima facie* case, Troy concedes that Helmuth is disabled and was a qualified individual under the ADA, meaning she could perform the job in question with or without accommodations. But Troy again challenges any allegation that Helmuth suffered an adverse employment action because of her disability on the same grounds Troy challenged it under her gender discrimination claim.

Specifically, Troy again argues that because it did, in fact, extend an offer of employment to Helmuth, although it was eventually rescinded, Helmuth is precluded from showing she suffered any adverse employment action. But the facts on this issue are clear; Troy ultimately failed to hire Helmuth and thereby foreclosed Helmuth's opportunity for employment by preventing her from proceeding further in the employment process. Certainly, then, Troy's failure to hire Helmuth was adverse under the disability discrimination analysis, just as it was under the gender discrimination analysis.

The larger question, which both parties struggle to address, is whether the eventual failure to hire Helmuth, be it Troy's rescission of the offer itself or its failure to consider an accommodation based on her disability, was based upon Helmuth's disability. While true that the ADA prohibits "denying employment opportunities to a job applicant . . . who is an otherwise qualified individual with a disability," such denial must be "based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) ("Liability in a disparate-treatment case [under the ADA] 'depends on whether the protected trait . . . actually motivated the employer's decision.'"). The record, and specifically the evidence detailing Helmuth's inquiry about being located at the Phenix City campus or to teach virtually, sufficiently shows that Helmuth has created a genuine issue of fact as to this causation element.

Troy's rescission of Helmuth's job offer came exactly two days after the phone call between Helmuth and Findley.  Notably, Helmuth used the phone call, in part, to question Findley about his assertion that no position in Phenix City was available. As Helmuth contends, Findley's stance conflicted with Wheatley's earlier remarks that a Phenix City position would soon become vacant. For his part, Findley disputes that Helmuth's relocation preference could be taken as a request for accommodation; "we never got that far" (presumably in the hiring process), he

insists. (Doc. 25-1, p. 18.) Yet it is difficult to disentangle Helmuth's disability-related request from Troy's position that, upon considering Helmuth's request, it stood "too far apart" to even continue having conversations.

That Troy fails to adequately address the legal framework surrounding Helmuth's claim, and further fails to adequately address the pertinent facts in its brief, only demonstrates that questions of fact exist that merit resolution at a trial. Indeed, the Court has no way of knowing whether Findley honestly considered that Helmuth's request for relocation or to teach virtually was disability-related, or if his asserted obliviousness on the subject is feigned. But as will be discussed, Helmuth has sufficiently shown a question of fact surrounding whether Troy's failure to hire her stemmed from her disability status.

The Court therefore moves on to the next phase of the *McDonnell Douglas* analysis; that is, Troy's proffered reasons for rescinding Helmuth's offer and Helmuth's demonstration of pretext.

### iii.   Troy's Proffered Reasons for Rescinding Helmuth's Offer

The burden at this stage of analysis lies with Troy to articulate a legitimate, non-discriminatory reason for its failure to hire Helmuth. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). Troy maintains it has done so, explaining that, during the phone call between Helmuth and Findley, Helmuth rejected Troy's offer of employment and demanded a $130,000 annual salary,

thereby giving Troy sufficient justification to believe that the parties stood "too far apart" to negotiate a higher salary or discuss a position relocation. (*See* Doc. 25-1, p. 11.) Despite lacking any pronounced specificity, the Court agrees that Troy has met its "exceedingly light" burden, thereby giving Helmuth the opportunity to demonstrate that Troy's articulated reason for the adverse employment action is mere pretext for discrimination. *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

### iv.   Demonstration of Pretext

With her shifted burden, Helmuth must meet the proffered reason "head on and rebut it." *Chapman,* 229 F.3d at 1030. The onus sits with her to show "both that the reason was false and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Notably, she may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. at 517.

Helmuth's demonstration of pretext for both her gender and disability discrimination claims falls into the latter category. As she correctly recognizes, "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" can constitute evidence of pretext when they exist to the degree that a reasonable factfinder would find the

reasons "unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). In other words, a plaintiff can demonstrate pretext "by showing that the employer's non-discriminatory reason should not be believed." *Lawver v. Hillcrest Hospice, Inc.*, 300 F. App'x 768, 772 (11th Cir. 2008).

Helmuth offers several examples of evidence to cast doubt on Troy's proffered reason for withdrawing Helmuth's offer, i.e., a negotiation impasse due to a salary demand of $130,000 that precluded any further employment discussions. These include: (a) Findley's mischaracterization of his conversation with Helmuth to Troy administrators about Helmuth's salary demand of $130,000 which, as the phone call transcript reflects, was never demanded, said or inferred; (b) Troy's contrary treatment of Vendette as compared to Helmuth as it concerns the leeway Troy gave him to negotiate his starting salary; and (c) Troy's shifting and inconsistent reasons for rescinding the job offer. Of these, the transcript itself all but seals the deal on Helmuth's burden at the pretext stage. The Court nevertheless analyzes each of these rebuttals in turn, beginning with Findley's role in the recission, and all told, determines that Helmuth sufficiently rebuts Troy's proffered reason "head on" as to both her disability and gender discrimination claims.

Findley, as the liaison between Helmuth and Troy, played an integral role in Troy's decision to rescind Helmuth's offer.[6] Indeed, he was the only Troy faculty member with whom Helmuth engaged in any sort of discussion of employment terms, and based upon Findley's representations – or mischaracterizations – of his conversation with Helmuth to other administrators, Troy states that the employment terms sought by Helmuth, primarily salary, revealed that the parties were "too far apart." Findley's credibility is thus central to Troy's position. *See Cleveland*, 369 F.3d at 1194 (recognizing plaintiff demonstrated pretext by attacking employer's credibility).

The transcript of the phone call between Helmuth and Findley makes clear that Helmuth never made the salary demand that Findley attributed to her. Whether Troy's insistence that Helmuth requested a $130,000 salary, which bases almost

---

[6] Findley's subordinate role here implicates the "cat's paw" theory of liability. This theory "seek[s] to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 n.6 (11th Cir. 2013). And to the extent that Findley was not the final decisionmaker for hiring the position at issue, which is somewhat supported by the record, Troy can still be held liable for discriminatory treatment based upon its blind reliance on Findley's recommendation. The "cat's paw" theory of liability operates to impute the discriminatory animus of a non-decisionmaker to a neutral decision maker – or Troy, as Helmuth alleges in this case – that acted as a mere conduit. *Crawford*, 529 F.3d at 979 n.21. In application, evidence of discriminatory animus surrounding Findley's role in withdrawing Helmuth's offer, compounded with purported final decisionmaker Edwards' "rubber stamp" on that recommendation, would subject Troy to liability for discrimination on the basis of gender and/or disability.

exclusively on the information Findley relayed to administrators about the call, is mistaken or contrived remains unknown; but by disputing ever having made that demand, which the transcript confirms, Helmuth has handily rebutted Troy's proffered reason for rescinding her offer – that the parties were "too far apart." Further questions concerning the veracity of Findley's version of the phone call linger, but those are better left for a jury to answer. *E.g., Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1559 (11th Cir. 1988) ("Assessing the weight of evidence and credibility of witnesses is reserved for the trier of fact.").

Helmuth's second piece of evidence supporting pretext is Troy's comparative treatment of Vendette, her husband, who is male and does not have a disability. Vendette had been employed as an assistant professor at Sorrell's Phenix City campus since 2015. When Troy hired him, it offered Vendette a position equivalent in status and title to the position now in question, and like Helmuth, he was initially offered a starting salary of $90,000. But unlike Helmuth, his attempts to negotiate his salary upward were welcomed by Findley. Indeed, rather than taking Vendette's attempts to discuss and negotiate a higher salary as a rejection of Troy's offer, as Troy explains it did with Helmuth, Findley passed Vendette's salary request on to his supervisors and countered with a salary of $100,000.  While this evidence does provide some additional support for Helmuth's overarching arguments of pretext, it

should be noted that, standing alone, this comparative treatment probably would not be enough to satisfy Helmuth's burden at the summary judgment stage.

Helmuth next underlines what she describes as Troy's shifting explanations for rescinding Helmuth's offer. She submits that Findley initially explained Troy's rescission decision based on Helmuth's request to be located alongside her husband at the Phenix City campus *and* due to Helmuth's unreasonable salary demands. But Troy abandoned Helmuth's location preference in its brief as one of Troy's proffered reasons; instead it focused the entirety of its argument on the salary Troy offered to Helmuth. This point also lends factual support to Helmuth's summary judgment position, although standing alone, it too probably would not be enough. *See Cleveland*, 369 F.3d at 1194-95 (employer's "shifting reasons" for explaining why its employee was prohibited from doing infomercials allowed the jury to infer that the real reason for the plaintiff's termination was discrimination on the basis of disability).

Finally, while Troy's inquiries into Helmuth's medical condition and disability provide a standalone basis for liability, Helmuth additionally cites the probing interview questions as an indicator of Troy's discriminatory motives, or at least to show Troy's hyperawareness of her disability. The extent to which that awareness played a role in Troy's rescission decision is unknown, and is arguably weak given that Troy made an initial offer of employment to Helmuth after making

the challenged inquiries. But a reasonable factfinder may very well infer that Troy did not disentangle its rescission from Helmuth's disability-related limitations when Helmuth did not accept the job offer outright without question, concern, or request for accommodation. *See Cleveland,* 369 F.3d at 1194 ("Once [the employer's] credibility was damaged, a rational jury could infer that he did not fire [the plaintiff] because of the [proffered reason], but rather because of her disability.").

Accordingly, the Court concludes that Helmuth has presented sufficient evidence for her failure-to-hire disability and gender discrimination claims (Counts I and III) to proceed, and therefore Troy's Motion on these claims is due to be denied.[7]

### C.     Failure-to-Accommodate Claim

Helmuth also focuses part of her ADA claim on Troy's failure to hire her within her accommodation request (Count I), and explicitly questions Troy's motives for foreclosing the option of teaching at Troy's Phenix City campus where her husband was located or teaching virtually as Troy has allowed other professors, including Vendette, to do. As Helmuth suggests, Troy thus has failed to accommodate her disability.

---

[7] Because the Court has concluded that Troy's summary judgment motion is due to be denied on both the gender and disability discrimination claims under *McDonnell Douglas*, there is no need to discuss the claims under the convincing mosaic standard.

As an initial matter, the Court recognizes that Helmuth sufficiently pled a failure-to-accommodate claim in her Complaint, in which she goes on to assert that an accommodation for her disability would not have imposed an undue hardship on Troy. (Doc. 1, pp. 12-13.) In their respective depositions, Wheatley and Findley appear to concede that an accommodation, whether it be physical location (Phenix City) or alternate teaching format (virtual), as Helmuth suggests, would not have imposed an undue hardship on Troy. For example, they briefly note that teaching virtually could be considered a reasonable accommodation, and they both recalled occasions when it was offered to other professors. (Doc. 25-1, p. 18; Doc. 25-7, p. 11.) Contradictory record evidence as to whether a position at Phenix City would soon become vacant also remains unresolved. While Helmuth claims that Wheatley informed her of a forthcoming Phenix City vacancy in conversation with her and Vendette, Wheatley claimed that he did not remember any such conversation with Helmuth about available positions at any of Troy's other campuses, such as Phenix City or Dothan. (Doc. 25-7, p. 11.)  And, other than Wheatley's statement, Helmuth offers no evidence that such an open position ever actually existed in Phenix City.

What is apparent is that Troy did not discuss, or even consider, a possible modification of the position with Helmuth from a reasonable accommodation standpoint. Factual questions continue to circle around whether Troy could have assigned Helmuth to the Phenix City campus, even if it had not rescinded her offer;

31

whether there was an available position in Phenix City; and whether Helmuth could have taught classes virtually.

Nevertheless, because Troy did not move for summary judgment as to Helmuth's failure-to-accommodate claim, the Court cannot adjudicate it on the merits at this juncture. *See Gentry v. Harborage Cottages–Stuart, LLLP*, 654 F.3d 1247, 1261 (11th Cir. 2011) (noting a district court commits reversible error when it enters judgment on claims not identified in the motion for summary judgment). And that Helmuth did not devote significant argument in her responsive brief to her failure-to-accommodate claim is not surprising given Troy's failure to move for summary judgment on this claim. *See Hargett v. Fla. Atl. Univ. Bd. of Trustees*, 219 F. Supp. 3d 1227, 1242 n.19 (S.D. Fla. 2016) (citing *Edwards v. Honeywell, Inc.,* 960 F.2d 673, 674 (7th Cir. 1992)) ("When a party moves for summary judgment on ground A, his opponent is not required to respond on ground B—a ground the movant might have presented but did not.") (internal quotations omitted). Helmuth's failure-to-accommodate claim (Count I) survives summary judgment.

### D.    Discriminatory Terms Claim[8]

To challenge the terms of the rescinded offer itself, Helmuth raises a separate discriminatory disparate treatment claim under the ADA  (Count I) and Title VII

---

[8] Because Troy's briefing focuses in large part on the salary and employment terms initially offered to Helmuth, the Court accepts that Troy sufficiently addresses this claim in its Motion despite not including a more suitable caption.

(Count III). Specifically, Helmuth takes issue with the $90,000 salary offer as compared to the $100,000 starting salary Troy previously offered Vendette for a similar position several years earlier. (*See* Doc. 1, pp. 13, 15; Doc. 27, p. 68.)

But to the extent Helmuth claims that the salary was indicative of Troy's discriminatory motives, her claim is unavailing. The salary she was offered – $90,000 annually – was consistent with the salary range that was advertised for the position and was the same that was later offered to both Montgomery (a male without a disability) and Newman (a female without a disability) for substantively equivalent, if not identical, positions. By its very nature, this treatment is not discriminatory. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1222 (11th Cir. 2019) ("[d]iscrimination consists of treating like cases differently") (quoting *N.L.R.B. v. Collier*, 553 F.2d 425, 428 (5th Cir. 1977)). Accordingly, any meaningful comparator analysis renders this claim unactionable, and Troy is entitled to summary judgment on this claim (Counts I and III).

### E.    Improper Medical Inquiry Claim

Helmuth's next claim centers on her in-person interviews. Specifically, she alleges that Troy violated the ADA's prohibition on excessively invasive medical inquiries (Count II) when Hawkins and Findley asked probing questions about her medical diagnosis, condition, and prognosis.

In addition to its prohibition of discriminatory hiring practices, the ADA, in § 12112(d)(2)(A), provides that "a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability." To state a claim for relief under this provision, a plaintiff must show damages, "emotional, pecuniary, or otherwise." *Harrison v. Benchmark Elecs. Huntsville, Inc.,* 593 F.3d 1206, 1216–17 (11th Cir. 2010).

True, this prohibition does not come without exception. Employers *are* permitted to make "pre-employment inquiries into the ability of an applicant to perform job-related functions, and/or may ask an applicant to describe or to demonstrate how, with or without reasonable accommodation, the applicant will be able to perform the job related functions." 29 C.F.R. § 1630.14(a); *see* 56 Fed.Reg. 35725, 35732 (1991); *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1312 (11th Cir. 2013) (finding employer did not violate ADA's medical examination prohibition when it subjected employee to mental evaluation because his mental state affected his job performance and potentially threatened the safety of other employees). But otherwise, it is "illegal for [an interviewer] to make targeted disability related inquiries," particularly those likely to elicit information about the disability itself. *Harrison*, 593 F.3d at 1215.

In its Motion, Troy submits that the purpose of the restriction on certain medical inquiries is to exclude questions "likely to allow employers to identify an otherwise unknown disability and then exclude those applicants from job consideration." (Doc. 21, p. 13.) Because it believes the challenged pre-offer inquiries were not asked to disqualify Helmuth and had no real business necessity, Troy appears to argue that it cannot be held liable for their discriminatory nature. But the prohibiting statute makes no exception for innocent questions, even if the questions were asked harmlessly out of compassion or concern. *Cf. Barnes v. Cochran*, 944 F. Supp. 897, 904 (S.D. Fla. 1996), *aff'd sub nom. Barnes v. Broward Cty. Sheriff's*, 130 F.3d 443 (11th Cir. 1997) (rejecting the defendant's argument that a medical examination is only improper when the examiner's primary intent is to determine whether the applicant has a disability); *Harrison*, 593 F.3d at 1216 (employer's mere presence in the room while a medical review officer questioned applicant about his confidential medical condition was sufficient to create a genuine issue of material fact as to improper medical inquiry claim). Troy's *post hoc* justification comes too late to shield it from liability.   In short, Hawkins and Findley crossed the proverbial line when they, even out of compassion, asked overbroad, intrusive questions that are not permissible under the ADA regardless of how innocent their intentions may have been.

Helmuth completes her requisite showing for this claim by demonstrating that, because of the improper inquiries, she became depressed, embarrassed, and demoralized, (Doc. 26-5, pp. 7-8), which are contentions that Troy leaves unchallenged in its summary judgment brief. Emotional damages can satisfy a plaintiff's burden under this statute, and even if Helmuth's claimed damages attributable to these inquiries are weak (especially considering Troy offered her a position after making these inquiries), Troy does not challenge this claim on this basis. *See Lisby v. Tarkett Alabama, Inc.*, Case No. 3:16-CV-01835-MHH, 2020 WL 1536386, at *8 (N.D. Ala. Mar. 31, 2020) (determining that emotional distress, without more, can support a medical inquiry claim) (citing *Russell v. City of Mobile Police Dep't*, 552 F. Appx. 905, 907 (11th Cir. 2014)). Helmuth has created a triable issue of fact with respect to her unlawful inquiry claim. Accordingly, Troy's Motion as to Helmuth's improper medical inquiry allegations (Count II) is due to be denied.

## F.    Failure to Reimburse Travel Costs Claim

Contained within Helmuth's disparate treatment claims (Counts I and III) is an additional allegation that Troy discriminated against her when it failed to reimburse Helmuth for her travel expenses; that is, the travel expenses she incurred in the course of traveling from Chicago to Troy for her in-person interview. She makes this claim after presenting Vendette's comparative experience in recovering his travel expenses for his own in-person interview three-years prior. According to

Vendette, his expenses were reimbursed by Troy "without question." (Doc. 26-6, p. 3.)

Helmuth brings these allegations under Title VII, the ADA, and Section 504, each of which requires an employee to demonstrate that she suffered an adverse employment action. And as with any disparate treatment claim, ultimately, the employee must show that the employer engaged in intentional discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 153 (2000).

Numerous questions exist about whether Troy's failure to reimburse Helmuth constitutes an adverse employment action sufficient to maintain this disparate treatment claim; yet in its Motion, Troy failed to move for summary judgment on this theory of recovery.

Helmuth highlights this omission in her response, and Troy's arguments for summary judgment on the claim, which are asserted for the first time in its reply brief, come too late. As a rule, "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court." *United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) (citation omitted); *Kellner v. NCL (Bahamas), LTD.*, 753 F. App'x 662, 667 (11th Cir. 2018) (applying the standard in a civil lawsuit). Because this argument was not raised in Troy's summary judgment Motion and brief, Troy's belated effort to have the Court toss this claim is futile. *See, e.g., Gentry*, 654 F.3d

at 1261. Accordingly, this claim (Counts I and III) will proceed as well, regardless of its strength.

## IV.   CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

(1)   To the extent Troy University seeks summary judgment on Helmuth's disability discrimination claims for failure to hire and failure to accommodate in Count I (ADA and Section 504), the Motion for Summary Judgment (Doc. 21) is DENIED.

(2)   To the extent Troy University seeks summary judgment on Helmuth's claims for failure to provide non-discriminatory terms of employment, such as salary, in Count I (ADA and Section 504), the Motion for Summary Judgment (Doc. 21) is GRANTED.

(3)   The Motion for Summary Judgment, (Doc. 21), as to Count II (Improper Medical Inquiry) is DENIED.

(4)   To the extent Troy University seeks summary judgment on Helmuth's disability discrimination claims for failure to hire in Count III (Title VII), the Motion for Summary Judgment (Doc. 21) is DENIED.

(5)   To the extent Troy University seeks summary judgment on Helmuth's claims for failure to provide non-discriminatory terms of employment,

such as salary, in Count III, the Motion for Summary Judgment (Doc.

21) is GRANTED.

DONE, on this the 19th day of March, 2021.

                                         _____/s/ R. Austin Huffaker, Jr._____
                                         R. AUSTIN HUFFAKER, JR.
                                         UNITED STATES DISTRICT JUDGE